F. Mark Hansen, #5078
F. Mark Hansen, P.C.
431 North 1300 West
Salt Lake City, UT 84116
(801) 517-3530
Attorney for Plaintiffs

FILED
U.S. DISTRICT COURT

2008 JUL 11  A 11: 55

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WORLD ENTERPRISES; ABM, INC.; SECURITY FUNDING, INC.; C.O.P. COAL DEVELOPMENT COMPANY; STANDARD INDUSTRIES, INC.; INTERNATIONAL ASSOCIATION OF UNITED WORKERS' UNION, <br><br> Plaintiffs, <br><br> vs. <br><br> AQUILA, INC.; DOES 1-20, <br><br> Defendants. | **COMPLAINT** <br><br> Case: 2:08cv00527 <br> Assigned To : Benson, Dee <br> Assign. Date : 7/11/2008 <br> Description: World Enterprises v. Aquila <br><br> Civil No. <br> Judge |

Plaintiffs complain and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     World Enterprises (World) is a Nevada corporation in good standing with its principal place of business in Utah.

2.     ABM, Inc. (ABM) is a Nevada corporation in good standing with its principal place of business in Utah.

3.     Security Funding, Inc. (Security Funding) is a Nevada corporation in good standing with its principal place of business in Utah.

4.     C.O.P. Coal Development Company (COP) is a Utah corporation in good standing with its principal place of business in Utah.

5.     Standard Industries, Inc. (Standard) is a Nevada corporation in good standing with its principal place of business in Utah.

6.     International Association of United Workers Union (IAUWU) is a Utah non-profit corporation with its principal place of business in Utah.

7.     Aquila, Inc. is believed to be a Delaware corporation with its principal place of business located in Missouri.

8.     Does 1-20 are persons whose identities are presently unknown, who at all pertinent times were agents of Aquila, and/or co-conspirators with Aquila.

9.     This is a civil action where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States. This court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1) and (c)(1).

10.    To the extent it may be required, this court has personal jurisdiction over the defendants on Plaintiffs' state common law claims pursuant to Utah Code Ann. §78B-3-205(1) ("the transaction of any business within this state") and (3) ("the causing of any injury within this state whether tortious or by breach of warranty").

11.    A substantial part of the events or omissions giving rise to the claim occurred in this district. Venue is proper in this court under 28 U.S.C. §1391(a)(2).

## BACKGROUND INFORMATION

12.    C. W. Mining Company (CWM) was a coal mine operator who produced coal from the Bear Canyon Mine, Emery County, Utah. COP owns the land and/or holds the mineral rights, which COP leased to CWM under terms requiring CWM to pay COP royalties for the coal CWM produced.

- 2 -

13.     CWM needed money for capital improvements and operating expenses. Among other things, CWM was changing its mining method from continuous mining to a more efficient and productive longwall mining system requiring a multi-million dollar capital investment. To raise that money CWM borrowed money from World, ABM, Security Funding, and others. Also to raise that money, pursuant to an advance payment agreement CWM sold, and Standard bought and paid CWM in advance for, coal that CWM had not yet produced, in quantities exceeding the amount of coal CWM was producing.

14.     To secure CWM's debts, CWM granted World, ABM, Security Funding and Standard security interests in all of CWM's assets, which they perfected by filing UCC-1 financing statements with the Utah Division of Corporations and Uniform Commercial Code.

15.     IAUWU is an unsecured creditor of CWM.

16.     CWM is indebted to Plaintiffs in at least the following amounts:

| World Enterprises | greater than $6 million. |
| Security Funding Co. | greater than $3 million. |
| ABM, Inc. | greater than $5 million. |
| Standard Industries | greater than $10 million. |
| C.O.P. Coal Dev. Co. | greater than $5 million. |
| IAUWU | greater than $15 thousand. |

17.     CWM's debts to its secured creditors far exceeded the total value of its assets. In a sale of CWM's assets at fair market value, any unsecured creditor of CWM would recover nothing.

18.     On October 30, 2007, Aquila obtained a judgment against CWM in Aquila, Inc. v. C. W. Mining Co., Case No. 2:05CV555 (U. S. District Court, D. Utah) (the Aquila lawsuit), making Aquila an unsecured creditor of CWM. CWM appealed Aquila's judgment on November 27, 2007, which made Aquila's judgment the subject of a bona fide dispute as to liability or amount.

- 3 -

19.     Shortly after Aquila obtained its judgment against CWM, Aquila began garnishing every party Aquila thought might be a source of income to CWM. Aquila knew or should have known that if it succeeded in tying up all of CWM's income sources with writs of garnishment, Aquila would put CWM out of business.

20.     Aquila garnished CWM's checking account with Bank of Utah, and took from the account approximately $275,000.00 which CWM had pledged as collateral and was subject to the prior perfected security interests of World, ABM, Security Funding and Standard, with World in the first secured position, and which had been earmarked to pay CWM's payroll. CWM was forced to sell some of its mining equipment to meet payroll and avoid being forced out of business by Aquila then and there.

21.     Aquila also served writs of garnishment on Tennessee Valley Authority, who had bought coal under a contract the proceeds of which had been assigned to Standard.

22.     CWM, Standard, World, ABM, and Security explained to Aquila that Aquila was impairing CWM's ability to stay in business, and that if Aquila wanted its judgment paid, it was in Aquila's interest to let CWM get the funds it needed to make its longwall mining system fully operational, which would give CWM a cash flow with which to pay Aquila. Aquila refused a request to return the garnished bank funds. Aquila said it didn't care if it did put CWM out of business, that Aquila didn't care about its costs because it could simply pass them along to its ratepayers, that Aquila had already obtained a rate increase that would pay Aquila the amounts represented by its judgment against CWM, and that all Aquila cared about at that point was looking aggressive in the eyes of the Missouri Public Service Commission. Standard explained that the proceeds of CWM's coal contracts were assigned to and belonged to Standard, and that Standard had agreed that upon receipt of the proceeds, Standard would make them available for CWM for longwall equipment acquisition and operating expenses. Aquila said

- 4 -

it was prepared to claim CWM's assignment of proceeds to Standard was a fraudulent transfer (although that was simply not true and Aquila knew it had no evidence to support such a position), and threatened to sue Standard on CWM's debt. Aquila demanded that a substantial part of the coal sale proceeds be paid to Aquila as a condition for Aquila's cooperation in releasing the rest of the proceeds, which was an act by Aquila of attempted theft by extortion.

23. For many years Standard has been CWM's exclusive broker of coal. Effective March 5, 2007, Standard and CWM executed a Coal Sales Agency Agreement reducing their course of dealing and performance to writing. Among other things, CWM by its course of dealing had assigned to Standard all amounts payable to CWM for the sale of coal. The Coal Sales Agency Agreement reduced this course of dealing to writing, and irrevocably assigned and conveyed to Standard any interest CWM had in amounts due or to become due under all present and future contracts with CWM's customers.

24. Aquila had bought coal pursuant to a September 2003 contract with CWM. Standard billed Aquila with Standard's own invoices for the coal delivered to Aquila, who paid Standard and not CWM for that coal. Based on the course of dealing and performance between CWM and Aquila, at all pertinent times Aquila has known or should have known of the arrangement between CWM and Standard by which CWM assigned all coal sales proceeds to Standard, who owned those proceeds free of claims by CWM, and who collected the proceeds for Standard's account and not CWM's.

25. On November 28, 2007 Standard brokered a Spot Coal Supply Agreement between CWM and UtahAmerican Energy, Inc. (UEI) in which UEI bought coal produced by CWM (the UEI contract). Under the advance payment agreement between Standard and CWM, Standard had already bought and paid for the coal subject to a duty to convey title in the coal to CWM's buyers. The UEI contract acknowledged CWM's assignment of the proceeds to Standard, and directed UEI to pay Standard

according to Standard's invoices. Because of CWM's assignment of the proceeds to Standard, UEI was not indebted to CWM in either money or property.

26. On January 2, 2008 Aquila obtained a writ of garnishment and served it on UEI. The writ of garnishment was issued pursuant to Utah R. Civ. Proc. 64D(i)(2), which provides, "A writ of continuing garnishment applies to payments to the defendant from the effective date of the writ until the earlier of the following: (C) the judgment is stayed." On January 8, 2007 Aquila, together with House of Pumps and Owell Precast, filed an involuntary Chapter 11 petition against CWM, case no. 08-20105 (U.S. Bankruptcy Court, D. Utah). Under 11 U.S.C. §362, the involuntary petition operated as a stay of Aquila's judgment against CWM. Standard's first invoice for goods delivered under the UEI contract was not due until at least January 27, 2008. As a result, Aquila's writ of garnishment to UEI would not have applied to any payments UEI was obligated to make under the UEI contract even if CWM had not assigned to Standard any interest CWM had in those payments.

27. CWM had more than twelve entity creditors who held claims against CWM that were not contingent as to liability or the subject of a bona fide dispute as to liability or amount. Under 11 U.S.C. §303(b)(1) an involuntary bankruptcy petition had to have three petitioners who held claims against CWM that were not contingent as to liability or the subject of a bona fide dispute as to liability or amount.

28. House of Pumps was the only one of the three petitioners who had standing to file an involuntary Chapter 11 petition against CWM. Aquila lacked standing because CWM's appeal of Aquila's judgment made the judgment the subject of a bona fide dispute as to liability and amount. Owell Precast lacked standing because CWM had tendered payment in full of its debt to Owell Precast before the petition was filed, making Owell Precast's claim the subject of a bona fide dispute as to liability and amount. Owell Precast joined in the filing because Aquila conspired with Owell, promising

- 6 -

to indemnify Owell for liability for damages incurred by Owell for their unlawful filing against CWM.

29.     Standard and CWM had mutually agreed that, upon receipt by Standard of the amounts UEI owed Standard under the UEI contract, Standard would make those amounts available to CWM to help keep CWM in business until CWM could make its longwall mining system profitable. Because of Aquila's writs of garnishment and bad faith involuntary Chapter 11 filing, and on information and belief other wrongful acts of Aquila as discovery will disclose, including on information and belief that Aquila threatened UEI with frivolous claims for fraudulent transfer and contempt of court if UEI paid its debt to Standard, Aquila caused UEI to refuse to pay for the coal it received under the UEI contract.

30.     After Aquila filed its involuntary Chapter 11 petition against CWM, Standard and CWM asked Aquila to release its writ of garnishment of UEI, or to agree for UEI to pay CWM directly, or to stipulate to a Garnishee Order or other court order for UEI to pay CWM directly, so that the proceeds from the UEI contract could be used to preserve CWM's coal lease with COP and other necessary operating expenses. Aquila refused or ignored those requests.

31.     CWM had been negotiating with Bank of Utah, who was prepared to loan CWM approximately $4 million. CWM would have used the loan to pay coal royalties and save its coal lease with COP, and  to pay for additional equipment needed to make CWM's longwall mining system productive and profitable. Aquila's acts including garnishment of every party Aquila saw as a source of income to CWM including Bank of Utah itself, and Aquila's filing of an involuntary bankruptcy petition against CWM, caused Bank of Utah to withdraw from making the loan.

32.     CWM had also been negotiating with A-Fab Engineering, from whom CWM was leasing much of its longwall mining equipment, to fund the acquisition of additional equipment needed to make CWM's longwall mining system productive and profitable. Aquila's acts  including garnishment of every

- 7 -

party Aquila saw as a source of income to CWM, and Aquila's filing of an involuntary bankruptcy petition against CWM, caused A-Fab to withdraw its support.

33.     CWM had also been negotiating with Fidelity Funding Co. for a loan to pay for additional equipment to make CWM's longwall mining system productive and profitable. Fidelity was ready to loan CWM several million dollars for that purpose. Aquila's acts including garnishment of every party Aquila saw as a source of income to CWM, and Aquila's filing of an involuntary bankruptcy petition against CWM, caused Fidelity Funding Company to decline the loan.

34.     As a result of the above, Aquila's actions deprived CWM of an approximate $4 million bank loan, nearly $3 million for advance coal purchases by Standard, and as much as $10 million or more in additional loans and equipment leases which if timely received would have enabled CWM not only to stay in business, but to make its longwall mining system productive and profitable.

35.     On information and belief, Plaintiffs anticipate discovery will show that Aquila's goal was to acquire CWM's coal lease with COP even if it meant putting CWM out of business.

36.     Aquila's actions made it impossible for CWM to keep its vendor accounts current, which led to most of its trade vendors making CWM pay COD. This severely hampered CWM's ability to buy parts and supplies needed to continue mining and to pay other creditors including COP.

37.     Aquila's actions made it impossible for CWM to pay its secured creditors, putting CWM into default with the secured creditors and leaving CWM with no ability to cure the defaults.

38.     Aquila's actions made it impossible for CWM to cure its default on royalties owed to COP.

39.     Aquila's actions made it impossible for CWM to continue mining operations, and forced CWM to sell its assets and go out of business, making CWM permanently unable to pay debts CWM would have paid but for Aquila's actions.

40.     For good and valuable consideration, CWM has assigned to World all claims CWM has or may have against Aquila and the other defendants in this action.

### FIRST CLAIM FOR RELIEF
### Conversion of World Enterprises' Property

41.     All preceding and following allegations are incorporated by reference.

42.     Aquila, an unsecured creditor of CWM, used a writ of garnishment to seize approximately $275,000.00 from CWM's bank account in which World had a prior perfected security interest.

43.     Aquila's writ of garnishment was act of wilful interference with World's security interest in that property, done without lawful justification, by which CWM (who has assigned its claim to World), subject to World's prior perfected security interest, was deprived of that money's use and possession, and by which World was deprived of the benefit of its security interest.

44.     Aquila has wrongfully converted World's interest in that money.

45.     World is entitled to enforce its security interest against Aquila.

46.     One or more of Does 1-20 are persons who will be identified through discovery, being the agents of Aquila through whom Aquila acted, and/or who caused, advised, instigated, aided, abetted, encouraged, supported, or ratified Aquila's acts, and are thereby liable for their own acts or as though they had performed the acts themselves.

47.     World is entitled to a judgment against Aquila and the above-described Does in an amount equal to the amount Aquila converted by garnishment from CWM's bank account, approximately $275,000.00, and interest from the time World's loss is fixed.

48.     The acts and omissions of Aquila and the above-described Does are the result of willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and a

disregard of, the rights of World. Pursuant to Utah Code Ann. §78B-8-201(1)(a), World is entitled to an award of punitive damages against Aquila and the above-described Does. Under the circumstances it would be just and equitable to award World punitive damages against Aquila and the above-described Does of at least six times compensatory damages.

## SECOND CLAIM FOR RELIEF
### Conversion of Standard Industries' Property

49.     All preceding and following allegations are incorporated by reference.

50.     Aquila, an unsecured creditor of CWM, used a writ of garnishment to tie up valuable property belonging to Standard and thereby prevent Standard from obtaining its property.

51.     Aquila's continued efforts to maintain the writ of garnishment and refusal to release the same was a wilful interference with Standard's property without lawful justification, by which Standard was deprived of the use and possession of Standard's property.

52.     Aquila has wrongfully converted Standard's property.

53.     One or more of Does 1-20 are persons who will be identified through discovery, being the agents of Aquila through whom Aquila acted, and/or who caused, advised, instigated, aided, abetted, encouraged, supported, or ratified Aquila's acts, and are thereby liable for their own acts or as though they had performed the acts themselves.

54.     Defendants are jointly and severally liable for the resulting injuries to Standard.

55.     Standard is entitled to a judgment against Aquila and the above-described Does in an amount equal to the property of Standard that Aquila converted by garnishment, valued at approximately $2.7 million, and interest pursuant to contract or statute from the time Standard's loss is fixed.

56.     Aquila's conversion of Standard's property was a direct and proximate cause forcing CWM out of business.  Standard is entitled to a judgment against Aquila and the above-described Does in an amount equal to all lost future profits Standard would have made from brokering coal mined by CWM, in an amount that has not been fully calculated but is presently believed to exceed $35 million.

57.     The acts and omissions of Aquila and the above-described Does are the result of willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Standard.  Pursuant to Utah Code Ann. §78B-8-201(1)(a), Standard is entitled to an award of punitive damages against Aquila and the above-described Does.  Under the circumstances it would be just and equitable to award Standard punitive damages against Aquila and the above-described Does of at least six times compensatory damages.

## THIRD CLAIM FOR RELIEF
### Abuse of Process - All Plaintiffs

58.     All preceding and following allegations are incorporated by reference.

59.     Shortly after Aquila obtained its judgment against CWM, Aquila began garnishing every party Aquila thought might be a source of income to CWM.  The garnishees either owed Standard and not CWM, or held property in which CWM had an interest that was subject to prior perfected security interests held by World, ABM, Security Funding, and Standard, so that Aquila would not benefit from the garnishments even if the garnishees did hold property of CWM.  Aquila knew or should have known that if it succeeded in tying up all of CWM's income sources with writs of garnishment, Aquila would put CWM out of business.  Since Aquila would gain nothing from the garnishments, Aquila's use of the processes of writs of garnishment was for an improper purpose for which the process was not designed, which was, not to collect on Aquila's judgment, but to put CWM out of business.

60. Aquila used the processes of a writ of garnishment against Bank of Utah to accomplish one or more improper purposes for which those processes were not designed, including to put Aquila, an unsecured creditor, into possession of property of CWM that CWM had pledged as collateral and was subject to prior perfected security interests leverage of CWM's secured creditors, with World having a first perfected security interest in that collateral.

61. Aquila used the processes of a writ of garnishment against UEI, and an unlawful bad faith involuntary bankruptcy petition against CWM and other proceedings within the bankruptcy itself including attempts at discovery and motions to hold Standard and COP in contempt, and to prevent CWM from exercising its right under 11 U.S.C. §303(f) to continue to operate as if an involuntary bankruptcy proceeding had not been commenced, to accomplish one or more improper purposes for which those processes were not designed, including to give Aquila, an unsecured creditor, leverage over CWM and secured creditors, to put pressure on CWM and secured creditors to pay Aquila money to which Aquila had no claim, to extort payments to which Aquila was not entitled, and to give Aquila more favorable treatment than Aquila was entitled to as an unsecured creditor.

62. Aquila used the processes of writs of garnishment served on coal buyers who owed Standard and not CWM, in furtherance of an improper purpose to obtain possession of property belonging to Standard, and in furtherance of that purpose offered to cooperate in the release of Standard's property upon payment of a portion thereof to Aquila, which offers constituted attempted theft by extortion.

63. Standard filed a motion to quash Aquila's writ of garnishment against UEI, so UEI would pay its debt and Standard could deliver the money to CWM as Standard and CWM had mutually agreed. Aquila opposed Standard's motion to quash the writ, and thereby caused UEI to withhold payment in breach of its contractual duty to pay Standard, by falsely arguing the money should ultimately be paid

to Aquila, even in preference to CWM's secured creditors – an argument that, if true, would have been an act by Aquila to exercise control over property of the CWM bankruptcy estate in violation of the bankruptcy automatic stay and in disregard of the rights of CWM's secured creditors to their collateral.

64.    Aquila knew or should have known that because CWM had appealed Aquila's judgment against CWM, Aquila's claim against CWM was the subject of a bona fide dispute as to liability or amount.  On information and belief as may be shown through discovery, Aquila also knew that Owell Precast, whom Aquila had solicited to join with Aquila in filing an involuntary bankruptcy petition, had in its possession a check from CWM paying Owell Precast in full, and induced Owell Precast not to cash CWM's check so that Owell could claim to be an unpaid creditor of CWM.  Aquila then caused an involuntary bankruptcy petition to be filed against CWM in violation of 11 U.S.C. §303(b)(1), with the improper purpose of interfering with CWM's right under 11 U.S.C. §303(f) to continue operating as though no petition had been filed, and for other improper purposes as on information and belief Plaintiffs may be able to establish through discovery.

65.    Aquila knew, or had information from which it should have known, that if Aquila did not interfere with CWM's efforts to get its longwall mining system into full production, CWM would be able to accomplish that goal and thereby increase productivity and ultimately operate profitably enough to pay all of its creditors in full including Aquila.  Aquila also knew, or had information from which it should have known, that if Aquila did try to enforce writs of garnishment or put CWM into bankruptcy, that Aquila would thereby render CWM unable to obtain financing needed to get its longwall mining system into full production, and that Aquila would thereby make it impossible for CWM to pay Aquila's judgment.  Aquila acted with knowledge of or in reckless disregard of the likelihood that its acts would put CWM out of business.

66. Aquila's acts as described above constitute an abuse of process.

67. Aquila's abuses of process were the direct and proximate cause forcing CWM to discontinue its mining operations, sell its assets and go out of business, making CWM permanently unable to pay debts CWM would have paid but for Aquila's abuses of process.

68. As a direct and proximate result of the above, Aquila caused injury to Plaintiffs.

69. One or more of Does 1-20 are persons who will be identified through discovery, being the agents of Aquila through whom Aquila acted, and/or who caused, advised, instigated, aided, abetted, encouraged, supported, or ratified Aquila's acts, and are thereby liable for their own acts or as though they had performed the acts themselves.

70. Plaintiffs are entitled to judgment against Aquila and the above-described Does in amounts to be proven at trial, including but not limited to the dollar amounts stated in paragraph 16 of this Complaint, an aggregate amount exceeding $29 million, plus late fees, penalties, collection costs and default interest pursuant to the Plaintiffs' various contracts. In addition, Standard is entitled to a judgment against Aquila and the above-described Does in an amount equal to all lost future profits Standard would have made from brokering coal mined by CWM, in an amount that has not been fully calculated but whose present value is presently believed to exceed $35 million.

71. The acts of Aquila and the above-described Does caused CWM to lose all future profits it would have made from the sale of coal. Defendants are jointly and severally liable for the resulting injuries to CWM, in the amount of all future profits CWM would have made from the sale of coal. World, as CWM's assignee and the real party in interest, is entitled to judgment against Aquila and the above-described Does in amounts to be proven at trial, in an amount that has not been fully calculated but whose present value is presently believed to exceed $150 million.

72.     The acts and omissions of Aquila and the above-described Does are the result of willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiffs.  Pursuant to Utah Code Ann. §78B-8-201(1)(a), Plaintiffs are entitled to an award of punitive damages against Aquila and the above-described Does.  Under the circumstances it would be just and equitable to award Plaintiffs punitive damages against Aquila and the above-described Does of at least six times compensatory damages.

## FOURTH CLAIM FOR RELIEF
### Intentional Interference With Economic Relations - All Plaintiffs

73.     All preceding and following allegations are incorporated by reference.

74.     Aquila intentionally interfered with the present and prospective economic relations between Plaintiffs and CWM by the improper means and/or for the improper purposes described above, and on information and belief other improper means and/or purposes as may be shown through discovery.

75.     Aquila's intentional interference caused CWM to default on its obligations to Plaintiffs and become permanently unable to pay those obligations, causing Plaintiffs injury.

76.     One or more of Does 1-20 are persons who will be identified through discovery, being the agents of Aquila through whom Aquila acted, and/or who caused, advised, instigated, aided, abetted, encouraged, supported, or ratified Aquila's acts, and are thereby liable for their own acts or as though they had performed the acts themselves.

77.     Defendants are jointly and severally liable for the resulting injuries to Plaintiffs in an amount equal to CWM's indebtedness under its various contracts and agreements with Plaintiffs.

78.     Plaintiffs are entitled to judgment against Aquila and the above-described Does in amounts to be proven at trial, including but not limited to the dollar amounts stated in paragraph 16 of this

Complaint, an aggregate amount exceeding $29 million, plus late fees, penalties, collection costs and default interest pursuant to the Plaintiffs' various contracts. In addition, Standard is entitled to a judgment against Aquila and the above-described Does in an amount equal to all lost future profits Standard would have made from brokering coal mined by CWM, in an amount that has not been fully calculated but whose present value is presently believed to exceed $35 million.

79.    The acts of Aquila and the above-described Does caused CWM to lose all future profits it would have made from the sale of coal. Defendants are jointly and severally liable for the resulting injuries to CWM, in the amount of all future profits CWM would have made from the sale of coal. World, as CWM's assignee and the real party in interest, is entitled to judgment against Aquila and the above-described Does in amounts to be proven at trial, in an amount that has not been fully calculated but whose present value is presently believed to exceed $150 million.

80.    The acts and omissions of Aquila and the above-described Does are the result of willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiffs. Pursuant to Utah Code Ann. §78B-8-201(1)(a), Plaintiffs are entitled to an award of punitive damages against Aquila and the above-described Does. Under the circumstances it would be just and equitable to award Plaintiffs punitive damages against Aquila and the above-described Does of at least six times compensatory damages.

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy - All Plaintiffs

81.    All preceding and following allegations are incorporated by reference.

82.    Defendants are a combination of two or more persons, who operated with a meeting of minds to accomplish the unlawful objects alleged above.

83.     One or more of Defendants committed overt acts in furtherance of the combination and conspiracy, resulting in injury to Plaintiffs as set forth above.

84.     Plaintiffs are entitled to an award of damages against Defendants, and each of them jointly and severally, in an amount to be determined at trial, including all damages alleged above.

85.     The acts of Defendants are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Plaintiffs are entitled to an award of punitive damages against Defendants, and each of them jointly and severally, in an amount of three times compensatory damages.


        WHEREFORE, Plaintiffs pray for relief as follows:

1.     On the First Claim for Relief, judgment in favor of World Enterprises and against Defendants and each of them jointly and severally, in an amount to be proved at trial of approximately $275,000.00, and interest from the time World's loss is fixed, and punitive damages of six times compensatory damages.

2.     On the Second Claim for Relief, judgment in favor of Standard Industries and against Defendants and each of them jointly and severally, in an amount equal to the property of Standard that Aquila converted by garnishing UEI, having a value of approximately $2.7 million, and interest pursuant to Standard's invoices or statute, from the time Standard's loss is fixed, and an amount to be proved at trial equal to all lost future profits Standard would have made from brokering coal mined by CWM, presently believed to exceed $35 million, and punitive damages of six times compensatory damages.

3.     On the Third, Fourth and Fifth Claims for Relief, a separate judgment in favor of each of the Plaintiffs, and against Defendants and each of them jointly and severally in amounts to be proven at

trial, including but not limited to the dollar amounts stated in paragraph 16 of this Complaint, an aggregate amount exceeding \$29 million, plus late fees, penalties, collection costs and default interest pursuant to each of the Plaintiffs' various contracts. In addition, a judgment in favor of Standard Industries and against Defendants and each of them jointly and severally, in an amount equal to all lost future profits Standard Industries would have made from brokering coal mined by CWM, presently believed to exceed \$35 million. In addition, a judgment in favor of World Enterprises as the assignee of CWM and the real party in interest, and against Defendants and each of them jointly and severally, in an amount to be proved at trial, presently believed to exceed \$150 million. In addition, punitive damages for all Plaintiffs of six times compensatory damages.

4.    On all claims for relief, interest, penalties, costs, expenses, and attorney fees as may be allowed by contract, statute, rule, or other law.

5.    Such other and further relief as the Court deems just and equitable.

DATED July 10, 2008.

Attorney for Plaintiffs

3059 p01 Complaint

- 18 -